## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

ANITA L. MASTIN,

      Plaintiff,

                                  **Civil Action 2:20-cv-3337**
                                  **Judge Michael H. Watson**
      v.                          **Magistrate Judge Elizabeth P. Deavers**

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

### REPORT AND RECOMMENDATION

Plaintiff, Anita L. Mastin ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for period of disability and disability insurance benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 23), the Commissioner's Memorandum in Opposition (ECF No. 26), and the administrative record (ECF Nos. 11, 20).  For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I.  BACKGROUND

On November 30, 2005, Plaintiff was found to be disabled as of September 4, 2003, due to Crohn's disease.  (R. at 98-124.)  On September 12, 2011, Social Security Disability Examiner Adam Myers examined Plaintiff and affirmed the finding of disability, noting that "[c]urrent evidence shows that there has not been significant improvement in her conditions."  (R. at 76.)

On December 21, 2016, Robert Steele, M.D. determined that Plaintiff's disability benefits should be ceased under 20 C.F.R. § 404.1594(F)(6), noting that "[t]here has been significant improvement" in Plaintiff's condition since the most recent examination, and finding that Plaintiff had no longer been disabled as of December 1, 2016.  (R. at 77-89.)

On January 11, 2019, upon Plaintiff's request, administrative law judge Raymond Rodgers (the "ALJ") held an administrative hearing, at which Plaintiff appeared and testified.  (R. at 35-75.)  A vocational expert ("VE"), Nicholas Fidanza, also appeared and testified at the administrative hearing.  (*Id.*)  On April 4, 2019, the ALJ issued a decision finding that Plaintiff's disability ended on December 1, 2016, and that Plaintiff had not become disabled again since that date.  (R. at 9-33.)  On April 27, 2020, the Appeals Counsel denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-3.)  Then, on July 1, 2020, Plaintiff timely commenced the instant action.  (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the January 2019 administrative hearing.  (R. at 43-56.)  Plaintiff testified that after she initially was found to be disabled, she had tried to work full-time on multiple occasions, but that she had to leave, or was let go, for performance issues related to being sick.  (R. at 44.)  Plaintiff also testified that, most recently, she worked part-time at Home Depot as a salesperson in the appliances department.  (R. at 45.)  Plaintiff said that at Home Depot, she worked in four-hour shifts and would have one scheduled break.  (R. at 45-46.)  Plaintiff testified that she missed a lot of work at Home Depot from being sick with Crohn's disease and from her other medical conditions.  (R. at 46-47.)

Plaintiff testified that the last time she saw a gastroenterologist was in May 2017.  (R. at 47-48.)  She testified that she gets diarrhea almost immediately upon putting anything into her stomach, and she also has a hard time sleeping.  (R. at 48-49.)  Plaintiff testified that on a typical day, she uses the bathroom a "minimum of ten" times, and usually has three bowel movements before noon.  (R. at 49.)  Plaintiff also testified that when she would take a break from her job at Home Depot, she could manage the timing of her breaks and make it through four-hour shifts twice.  (*Id.*)  Plaintiff testified that she had a lifting restriction when she worked at Home Depot because she has had three knee replacements, and that she still can't get on hard floors on her knees.  (R. at 50.)  Plaintiff testified that she has neck pain that shoots into her fingers on her left hand, and that a doctor recommended that she get surgery but she was unable to due to her heart condition.  (R. at 50-51.)[1]

Plaintiff testified that she currently takes medications for her blood pressure, pain, and anxiety, including Lasix, Eliquis, baby aspirin, Lomotil, and Phenergan.  (R. at 52-55.)  She also testified that doesn't enjoy reading books anymore, and that she is fatigued all of the time.  (R. at 53.)  Plaintiff testified that "there's never normal walking" and that "stair[s] are impossible" given her knee replacements, and she said that her bathroom breaks can be quite lengthy.  (R. at 54.)  Plaintiff testified that she does not wear adult undergarments.  (*Id.*)

## B.    Vocational Expert's Testimony

Mr. Nicholas Fidanza testified as the VE at the administrative hearing.  (R. at 59-69.) Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical

---

[1] Plaintiff's attorney then clarified that the medical record "didn't look like [the doctor] actually gave a surgical recommendation on paper," and in fact recommended steroid injections before considering surgery.  (R. at 51.)

3

individual could perform the following jobs that exist in significant numbers in the national economy:  table worker, final assembler, and semiconductor bonder.  (R. at 62.)

## III.  RELEVANT RECORD EVIDENCE

### A.  Bradley W. Trope, M.D.

On January 17, 2017, Plaintiff reported to gastroenterologist Bradley W. Trope, M.D., to establish care.  (R. at 1505-1509.)  Plaintiff reported that she was originally diagnosed with IBD at age 19, and that she presently was off medication.  (R. at 1505.)  Plaintiff told Dr. Trope that she was "now having up to 10 [bowel movements] daily with mucus but no blood," and Dr. Trope noted that the "onset was gradual and lasting for years in a recurrent pattern."  (*Id.*)  Dr. Trope assessed Plaintiff to have histoplasmosis and Crohn's disease of both small and large intestine without complication, and noted that extensive counseling would need to be performed regarding Plaintiff's evaluation and/or treatment.  (R. at 1508.)  Dr. Trope also found that Plaintiff's c-reactive protein level was within the normal range.  (R. at 1509.)

On March 1, 2017, Plaintiff underwent a colonoscopy.  (R. at 1586-1587.)  Dr. Trope reviewed the results and found them to be normal, with "no immediate complications."  (*Id.*)

### B.  Stephanie Lage, PA-C

On March 29, 2017, Plaintiff saw Stephanie Lage, PA-C, complaining of neck and left arm pain.  (R. at 1520-1531.)  Plaintiff reported no nausea, vomiting, diarrhea, constipation, heartburn, abdominal pain, blood per rectum, or incontinence, and PA Lage noted no balance disturbances and a normal gait.  (R. at 1523.)  PA Lage also reported full 5/5 strength throughout Plaintiff's body, and found no pain to palpation of the cervical, thoracic, or lumbar spine or para-vertebral muscles.  (R. at 1523-1524.)  PA Lage diagnosed Plaintiff with cervical spondylosis. (R. at 1525.)

C.    **Douglas S. Hughes, M.D.**

On April 10, 2017, Douglas S. Hughes, M.D., Plaintiff's treating primary care physician, completed a questionnaire indicating that Plaintiff's mood was "depressed and flat," and that while she presented with a "normal appearance" she was "obviously[] depressed." (R. at 1490-1492.) Dr. Hughes diagnosed Plaintiff with "Major Depressive Disorder + Generalized Anxiety Disorder" and wrote that her prognosis was "Guarded." (R. at 1491.) He further wrote that Plaintiff "is unable to concentrate for long periods of time" and that "anxiety effects her ability to function socially." (R. at 1492.) On May 4, 2018, Dr. Hughes wrote on a prescription pad that Plaintiff "is to be restricted to lifting no more than 5 lbs" and "she is also to have a chair at her desk and is not to climb ladders." (R. at 1941.)

On August 2, 2018, Plaintiff reported to Dr. Hughes for a follow-up visit. (R. at 1903.) Dr. Hughes wrote that Plaintiff's "lumbar pain is controlled with current medication regimen" and that "[h]er husband feels she is on the verge of a 'nervous break down.'" (*Id.*) Plaintiff's husband also told Dr. Hughes that Plaintiff "has been confused and unable to comprehend conversations and certain situations." (*Id.*) Dr. Hughes instructed Plaintiff's husband to drive Plaintiff to the hospital for further evaluation. (R. at 1904.) On August 4, 2018, Plaintiff saw Dr. Hughes for a follow-up visit after being discharged from Health Park Hospital. (R. at 2017-2018.) Plaintiff reported that she was cleared by the Neurology team at the hospital and it was suspected that polypharmacy was the cause of her mental confusion. (*Id.*) Dr. Hughes noted that "[s]he is feeling great since being discharged," and that "[s]he denies nausea, vomiting, diarrhea." (*Id.*) On September 13, 2018, Plaintiff returned to Dr. Hughes for a follow-up visit. (R. at 1816.) Plaintiff reported that she needed to take medication every six hours due to her

heightened anxiety and feelings of confusion, and she again reported that her lumbar pain was controlled by medication.  (*Id.*)

On October 30, 2018, Plaintiff saw Dr. Hughes in anticipation of her Social Security hearing.  (R. at 2015.)  Plaintiff reported heightened anxiety that was stabilized with medication, and she stated that she continued to have sharp pain in her left hip and increasing nerve pain in her left arm and hand.  (*Id.*)  Plaintiff reported that she vomits every morning and has nausea throughout the day, about ten times per day.  (*Id.*)  On December 14, 2018, Dr. Hughes wrote an open letter stating that Plaintiff "is not a malingerer" and that "[s]he does have issues with her memory that are most likely related to her significant depression and anxiety."  (R. at 2094.)

**D.     Cheryl Kasprzak, Psy.D.**

On May 8, 2017, Plaintif was seen by Cheryl Kasprzak, Psy.D., for a clinical evaluation with mental status examination at the request of the Department of Disability Services.  (R. at 1540-1544.)  Dr. Kasprzak reported that Plaintiff's reliability was "questionable," so Plaintiff was asked to take a Structured Inventory of Malingered Symptomatology ("SIMS") test, which Plaintiff did.  (R. at 1540.)  Dr. Kasprzak described Plaintiff as "annoyed," and wrote that Plaintiff's SIMS score of 17 was "significantly elevated above the recommended cutoff score for identification of suspected malingering."  (R. at 1541-1543.)  Dr. Kasprzak also noted that Plaintiff "endorsed a high frequency of symptoms that are atypical in patients with genuine psychiatric or cognitive disorders, raising the suspicion of malingering."  (R. at 1543.)  Dr. Kasprzak diagnosed Plaintiff with moderate, recurrent major depressive disorder and moderate alcohol use disorder.  (*Id.*)

**E.      Seth Lipka, M.D. and Renee Marchioni Beery, DO**

On May 17, 2017, Plaintiff was referred by Dr. Trope for a consultation with Seth Lipka, M.D. and Renee Marchioni Beery, DO.  (R. at 1682-1691.)  Dr. Lipka noted that "[t]hankfully, her Crohn's disease is quiescent at this time based on [her] recent colonoscopy showing deep remission."  (R. at 1689.)  Dr. Lipka concluded that "[m]y impression was that [Plaintiff] and her husband were overall content with her current state and were generally unwilling to discuss alternative treatment options or possibilities for the management of her Crohn's or diarrhea symptoms."  (R. at 1690.)  Dr. Beery agreed with Dr. Lipka's notes.  (*Id.*)

**F.      David Clay, Ph.D.**

On May 23, 2017, Plaintiff saw David Clay, Ph.D., for a psychiatric review.  (R. at 1556-1570.)  Dr. Clay determined that Plaintiff had "depressive, bipolar and related disorders," but found that they were not severe.  (R. at 1556.)  Dr. Clay found that Plaintiff had mild limitations with regard to her ability to understanding, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.  (R. at 1568.)  Dr. Clay then found that Plaintiff's limitations were mild, and he opined that Dr. Hughes' opinion "is considered, but is not adequately supported" because "Dr. Hughes did not provide his clinical observations to support [his] conclusions, [Plaintiff's] functional information is more consistent with a primarily physical inhibitor to work related activities, and [Dr. Kasprzak] noted a strong possibility of malingering [symptoms]."  (R. at 1570.)  Dr. Clay found that Plaintiff's physical ailments "appear[] to be the primary inhibitor for [Plaintiff] and should be assessed elsewhere."  (*Id.*)  Dr. Clay concluded that Plaintiff "is considered to be partially credible" and that she "is functional [within] the boundaries of physical ailments."  (*Id.*)

### G.    Ronald Machado, M.D.

On May 26, 2017, Plaintiff saw Ronald Machado, M.D., for a physical residual functional capacity ("RFC") assessment.  (R. at 1548-1555.)  Dr. Machado found that Plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds; could frequently lift and/or carry (including upward pulling) 10 pounds; could stand and/or walk (with normal breaks) for a total of at least 2 hours in an 8-hour workday; could sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and had no other pushing or pulling limitations.  (R. at 1549.)  Dr. Machado also found that Plaintiff could occasionally climb ramps or stairs and balance; could never climb ladders, ropes, or scaffolds; and otherwise had no limitations with regard to stooping, kneeling, crouching, or crawling.  (R. at 1550.)  Dr. Machado also found that Plaintiff had no manipulative, visual, communicative, or environmental limitations, except that Plaintiff should avoid even moderate exposure to hazards such as machinery or heights.  (R. at 1551-1552.)  Dr. Machado concluded that Plaintiff "no longer meets the inflammatory bowel disease listing" and "[t]he evidence shows medical improvement and no physical allegations that meet other listings."  (R. at 1555.)

### H.    Florida Heart Associates

On May 8, 2018, Plaintiff reported to Florida Heart Associates complaining of edema.  (R. at 1935-1939.)  Plaintiff reported that she worked part-time at Lowe's,[2] and that she recently had to stand for an eight (8) hour shift, during which she developed lower extremity and abdominal edema.  (R. at 1936.)  On May 15, 2018, Elizabeth Cosmai, M.D., FACC, found that

---

[2] Plaintiff's wage information reflects that she was employed by The Home Depot USA, Inc. and Home Depot USA (collectively, "Home Depot") from the first quarter of 2016 through at least the third quarter of 2018.  (R. at 212-213.)

Plaintiff's symptoms were consistent with "NYHA Classification" II, due to her mild symptoms and slight limitation during ordinary activity. (R. at 1695.)

## I.  Imaging and Diagnostic Testing

On February 28, 2018, Plaintiff underwent an MRI of her cervical spine, which showed C5-6 spondylosis with a left sided foramina stenosis and some mild spondylosis at C6-7. (R. at 1525.)

On April 26, 2018, Plaintiff underwent an MRI of her lumbar spine. (R. at 1591-1592.) The MRI showed no disc herniations or evidence for canal or neural foraminal narrowing in the lumbar levels, mild degenerative changes at the left facet joint of L5-S1, and heterogeneous bone marrow signal intensity suggestive of red marrow reconversion. (R. at 1591.) Also on April 26, 2018, Plaintiff underwent a DEXA Bone Densitometry exam which showed osteopenic bone mineral density of the lumbar spine but normal density of the left femoral neck and left total hip. (R. at 1593.)

On August 2, 2018, Plaintiff underwent a variety of diagnostic tests at Health Park Hospital, including the following: (1) a CT scan of her head, which was unremarkable; (2) an x-ray of her chest, which was unremarkable; (3) an MRI of her head, which evidenced minimal findings of nonspecific periventricular white matter foci of T2/FLAIR prolongation and findings which could be seen as sequela of migraines; and (4) an x-ray of her hip, which was negative. (R. at 2045-2049.) On August 3, 2018, Plaintiff underwent an echocardiogram which evidenced normal left ventricular systolic function and an ejection fraction of 55%. (R. at 2050-2052.)

## J.  State Agency Consultant

State Agency consultant Robert Steele, M.D., reviewed Plaintiff's file at the initial level on December 21, 2016, and provided assessments of Plaintiff's physical RFC. (R. at 78-88.)

Specifically, Dr. Steele found that Plaintiff could occasionally lift and/or carry up to 20 pounds and lift and/or carry up to 10 pounds; stand and/or walk (with normal breaks) for about four hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; was otherwise unlimited in her ability to push and/or pull (including operation of hand and/or foot controls); was occasionally limited in climbing ramps/stairs, balancing, stooping (i.e., bending at the waist), kneeling, crouching (i.e., bending at the knees), and crawling; and was never limited in climbing ladders/ropes/scaffolds.  (R. at 85-86.)  Dr. Steele found that Plaintiff had no other postural, manipulative, visual, or communicative limitations, but that she had some environmental limitations, as she should avoid concentrated exposure to vibration and hazards (machinery, heights, etc.).  (R. at 86-87.)  Dr. Steele found that "[t]here has been significant medical improvement in that [C]rohn's is in remission."  (R. at 87.)  Accordingly, Dr. Steele determined that Plaintiff's benefits should be ceased.  (*Id.*)

## IV.  ADMINISTRATIVE DECISION

On April 4, 2019, the ALJ issued his decision.  (R. at 9-33.)  At the outset, the ALJ noted that the most recent favorable medical decision finding that Plaintiff continued to be disabled, known as the "comparison point decision" ("CPD"), was the September 12, 2011 determination. (R. at 14.)  Then, at step one of the sequential evaluation process,[3] the ALJ found that Plaintiff

---

[3] Social Security Regulations require ALJs to determine whether a claimant continues to be disabled through an eight-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1594. Although the ALJ's review may cease at any point if there is sufficient evidence that the claimant is still unable to engage in substantial gainful activity, the complete sequential review poses eight questions:

    1.      Is the claimant engaging in substantial gainful activity? If so, disability has ended.

    2.      Do the claimant's impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of

had not engaged in any disqualifying substantial gainful activity through the date of the decision. (R. at 14.) At step two, the ALJ found that since December 1, 2016, Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step three, the ALJ found that medical improvement occurred on December 1, 2016. (R. at 18.) At step four, the ALJ found that the medical improvement was related to the ability to work because, by December 1, 2016, Plaintiff's CPD impairments no longer met or medically equaled the same listings that was met at the time of the CPD. (*Id.*) At step six, the ALJ found that since December 1, 2016, Plaintiff had continued to have a severe impairment or combination of

---

Impairments (the "Listings"), 20 C.F.R. Subpart P, Appendix 1? If so, disability continues.

3.    Has there been medical improvement? If not, proceed to Step Five.

4.    If there has been medical improvement, is it related to the claimant's ability to work? If not, proceed to Step Five. If so, proceed to Step Six.

5.    Does an exception to medical improvement apply? If there has been no medical improvement at Step Three or if it is not related to the claimant's ability to work at Step Four, and no exception applies, disability continues.

6.    Are all of the claimant's current impairments in combination severe? If not, disability has ended.

7.    If the impairment(s) is severe, considering the claimant's RFC, can he or she perform his or her past relevant work? If so, disability has ended.

8.    Assuming the claimant can no longer perform his or her past relevant work—and also considering the claimant's age, education, past work experience, and RFC—do significant numbers of other jobs exist in the national economy which the claimant can perform? If so, disability has ended. If not, disability continues.

*Harraway v. Comm'r of Soc. Sec.*, No. 3:16-CV-110, 2017 WL 3327032, at *3 (S.D. Ohio Aug. 4, 2017), *report and recommendation adopted*, No. 3:16-CV-110, 2017 WL 3588900 (S.D. Ohio Aug. 21, 2017). There is no presumption of continuing disability. *Id.* (citing *Kennedy v. Astrue*, 247 F.Appx. 761, 764.) However, the "ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.*

impairments. (*Id.*) Then, at step seven, the ALJ set forth Plaintiff's RFC since December 1, 2016 as follows:

> Based on the impairments present since December 1, 2016, the claimant has had the residual functional capacity to: lift/carry 10 pounds occasionally and 5 pounds frequently; sit for six hours in an eight hour workday; stand and/or walk for two hours in an eight hour workday; no operation of foot controls; less than occasional climbing of ramps or stairs; frequent head turning; occasional balancing, stooping, kneeling and crouching; no crawling; frequent handling and fingering; must avoid exposure to very loud noise as defined by SCO code and extreme bright lighting; must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dust and gases; no exposure to hazardous machinery; permitted to have two additional bathroom breaks of no more than five minutes both before and after lunch or meal break; able to understand, remember carryout simple tasks; work in a low stress job defined only occasional decision-making and only occasional changes in the work setting; occasional interaction with coworkers and supervisors; and no interaction except incidental with the public.

(R. at 19.) Finally, at step eight, the ALJ found that because Plaintiff had no past relevant work, transferability of job skills was not an issue, and that since December 1, 2016, considering Plaintiff's age, education, work experience, and RFC, Plaintiff had been able to perform a significant number of jobs in the national economy, including: table worker; final assembler; and semi-conductor bonder. (R. at 24-25.) The ALJ therefore concluded that Plaintiff's disability ended on December 1, 2016, and that Plaintiff had not become disabled again since that date. (R. at 25.)

The ALJ addressed each of Plaintiff's alleged impairments. (R. at 19-24.) First, the ALJ discussed the subjective evidence in the record concerning Plaintiff's alleged physical and mental impairments, before concluding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. at 19-20.) The ALJ then turned to the abundance of objective evidence in the record, which the ALJ concluded "demonstrates that [Plaintiff] is capable of sedentary work activity consistent with the [RFC] finding." (R. at 20.) Specifically, the ALJ noted that Plaintiff's "extreme allegations of

12

debilitating back pain, deficits from her heart condition and limitations from her IBS/Crohn's disease, headaches and obesity are contradicted by imaging, generally objective findings from physical examinations, and high functioning activities of daily living that include ongoing part time work as a client specialist for Home Depot since December 2016." (*Id.*)

In support, the ALJ first reviewed and discussed Plaintiff's various imaging and diagnostic testing. (R. at 20.) The ALJ then focused extensively on Plaintiff's physical examination findings and medical treatment notes. (R. at 20-22.) Specifically, the ALJ focused on a litany of examination findings from the cardiologists, gastroenterologists, neurosurgeon, and neurologist who treated Plaintiff, which were generally normal and did not present Plaintiff as in distress. (*Id.*) The ALJ determined that these findings were supported by Plaintiff's inconsistent treatment history, as the ALJ noted that Plaintiff had never been recommended for back surgery, she was not prescribed physical therapy, she was never prescribed narcotics for her pain, and the record "shows no more than sedentary work limitations." (*Id.*) The ALJ discussed Plaintiff's cardiac deficits, but noted that she is stable with as-needed conservative treatment. (R. at 22.) Finally, the ALJ emphasized that Plaintiff's "most recent colonoscopy showed her Crohn's disease was in deep remission." (*Id.*)

With regard to Plaintiff's mental health treatment, the ALJ reviewed Plaintiff's March 29, 2017 evaluation by PA Lage, at which Plaintiff appeared "obviously depressed," and compared it to Plaintiff's May 8, 2017 evaluation by consultative examiner Dr. Kasprzak, at which Plaintiff was "annoyed," which the ALJ concluded was "suggestive of noncompliance." (R. at 22-23.) The ALJ also noted that there was no indication in the record that Plaintiff sought specialized mental health treatment, that she attended outpatient counseling, or that she ever required hospital admission, which the ALJ concluded "strongly suggests that the symptoms may not

have been as serious as has been alleged." (R. at 23.) The ALJ also put significant value into Plaintiff's "high functioning activities of daily living," including Plaintiff's statements that "manages her medications independently using alarms; prepares meals; puts the laundry and dishes away; drives and walks; goes out alone; shops in stores once a week; manages money; reads, plays computer games and watches TV daily; spends time with her husband and mother; has dinner at her mother's once a week; is able to follow written and spoken instructions; gets along very well with authority figures; and has never been fired from a job for difficulty getting along with others." (*Id.*, citing R. at 288-295.) The ALJ also stressed that the fact that Plaintiff has worked part time, approximately twenty hours per week, since December 2016 "shows much greater functioning than alleged." (R. at 23.)

The ALJ then considered the opinion evidence of record. (R. at 23-24.) First, the ALJ assigned "little weight" to the opinion of Dr. Machado, because "[t]he opinions were not based on the most recent evidence of record, which shows the claimant is more limited than previously determined, as evidenced by diagnostic imaging, physical examination findings and the claimant's treatment history, which show reduced functioning." (R. at 23.) The ALJ also assigned "little weight" to the opinion of Dr. Clay, for the same reasons. (R. at 23-24.) The ALJ then assigned "little weight" to the opinion of Dr. Hughes for a variety of reasons:

> The undersigned gives little weight to the opinion of Dr. Hughes, a treating primary care physician who opined: that the claimant is restricted to lift no more than five pounds, have a chair at her desk and no climb ladders; has concentration, memory, social functioning and adaption deficits; and again, issues with anxiety, depression and her memory while not being a malingerer. Dr. Hughes' opinion with respect to the claimant's physical functioning is inconsistent with physical examinations from the claimant's treating neurologist that show normal strength in the upper and lower extremities as well as physical examination findings by the claimant's treating neurosurgeon that show a normal gait, normal strength in the upper and lower extremities and normal coordination. It must be noted that both of the aforementioned physicians are specialists. Dr. Hughes opinion is inconsistent with mild findings from the claimant's lumbar MRI and even the claimant's cervical

14

imaging. Lastly, Dr. Hughes' opinion is inconsistent with cardiology and gastroenterology treatment notes demonstrating stable to improved symptoms as well as the claimant's activities of daily living that include consistent part time work activity since 2016. Dr. Hughes opinion with respect to the claimant's mental functioning is inconsistent with mental status findings from the consultative examiner, who is a licensed psychologist, as well as mental status findings from the claimant's treating neurologist, again another specialist. Additionally, Dr. Hughes opinion is inconsistent with the claimant's lack of specialized mental health treatment, his lack of specialty since he is opining about an area outside his expertise since he is a primary care physician, and the claimant's high functioning activities of daily living that include consistent part time employment of up to 20 hours a week. Lastly, Dr. Hughes's opinion that the claimant is not a malingerer is irrelevant since the consultative examiner's psychometric testing with respect to malingering part of the rationale of this decision as indicated to counsel during the hearing.

(R. at 24.)  Finally, the ALJ afforded "significant weight" to Dr. Cosmai's opinion that Plaintiff's cardiovascular impairment was consistent with New York Heart Association Classification II, because "Dr. Cosmai is a specialist in cardiovascular medicine and her opinion is well supported by diagnostic testing, her physical examination of the claimant, and her specialized expertise." (*Id.*)

Then, relying on testimony from the VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC based on the impairments present since December 1, 2016, she could perform jobs that existed in significant numbers in the national economy, including: table worker; final assembler; and semi-conductor bonder.  (R. at 25.)  The ALJ therefore concluded that Plaintiff's disability ended on December 1, 2016, and Plaintiff had not become disabled again since that date.  (R. at 25-26.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d

270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the [Social Security Administration] fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of*

*Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

Plaintiff puts forth two assignments of error: that the ALJ failed to provide "good

reasons" for discounting the opinion of Plaintiff's treating physician Dr. Hughes; and that the

ALJ's RFC inadequately accounts for Plaintiff's gastrointestinal issues.  (*See generally* ECF No.

23.)  First, Plaintiff argues that while the record supports Dr. Hughes' opinion, the ALJ cherry-picked "selective portions in the record that would seemingly contradict Dr. Hughes' opinions." (*Id.* at PAGEID # 2454.)  Plaintiff submits that "[t]here are bound to be normal examination findings" in the record, but the ALJ failed to identify any evidence that actually contradicts Dr. Hughes' treating source opinion.  (*Id.*)  Additionally, Plaintiff argues that the ALJ's "seemingly arbitrary" limitation regarding Plaintiff's bathroom breaks "is not supported by the record[,] nor does the ALJ provide any sort of explanation as to why this particular limitation is supported by the record."  (*Id.* at PAGEID # 2455.)  Accordingly, Plaintiff believes this error "casts doubt as to the credibility of the [RFC]."  (*Id.* at PAGEID # 2457.)

In response, the Commissioner argues that the ALJ properly evaluated Dr. Hughes' treating source opinion, but ultimately discredited it because it was inconsistent with the treatment records of three different specialists, a plethora of diagnostic imaging, and Plaintiff's own activities of daily living, including her part-time work activity at Home Depot.  (*See generally* ECF No. 26.)  The Commissioner also responds that the bathroom break limitation in the ALJ's RFC is supported by substantial evidence, and that it constitutes "a limitation in the RFC that no doctor thought was necessary."  (*Id.* at PAGEID # 2476.)

Plaintiff did not file a Reply brief.  Accordingly, the matter is ripe for judicial review.

## A.     The ALJ Provided "Good Reasons" for Affording Dr. Hughes' Opinion "Little Weight"

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms,

diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(1).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ."  20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408.  If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).  If the ALJ does not afford controlling weight to a treating physician's opinion, then the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x

543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the

Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v.

Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors

within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.

2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision). Finally, the Commissioner reserves the power to

decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d).

Although the ALJ will consider opinions of treating physicians "on the nature and severity of

your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled

to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir.

2007).

Here, the Parties do not dispute that Dr. Hughes was Plaintiff's treating physician, nor

that his opinion would be entitled to controlling weight if it was "well-supported by medically

acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other

substantial evidence in the case record . . . ." (*See* ECF No. 26 at PAGEID # 2469, citing 20

C.F.R. § 404.1527(c)(2).)  After reviewing Dr. Hughes' opinion, the ALJ found that his opinion deserved only "little weight," for the following reasons:  (1) "Dr. Hughes' opinion . . . is inconsistent with physical examinations from [Plaintiff's] treating neurologist that show normal strength in the upper and lower extremities as well as physical examination findings by [Plaintiff's] treating neurosurgeon that show a normal gait, normal strength in the upper and lower extremities and normal coordination"; (2) "Dr. Hughes' opinion is inconsistent with mild findings from [Plaintiff's] lumbar MRI and even [Plaintiff's] cervical imaging"; (3) "Dr. Hughes' opinion is inconsistent with cardiology and gastroenterology treatment notes demonstrating stable to improved symptoms as well as [Plaintiff's] activities of daily living that include consistent part time work activity since 2016"; (4) "Dr. Hughes' opinion with respect to [Plaintiff's] mental functioning is inconsistent with mental status findings from the consultative examiner, who is a licensed psychologist, as well as mental status findings from [Plaintiff's] treating neurologist"; (5) "Dr. Hughes' opinion is inconsistent with [Plaintiff's] lack of specialized mental health treatment, his lack of specialty since he is opining about an area outside his expertise since he is a primary care physician, and [Plaintiff's] high functioning activities of daily living that include consistent part time employment of up to 20 hours a week"; and (6) "Dr. Hughes' opinion that [Plaintiff's] is not a malingerer is irrelevant since the consultative examiner's psychometric testing with respect to malingering part of the rationale of this decision as indicated to counsel during the hearing."  (R. at 24.)  Plaintiff argues these explanations did not constitute "good reasons" for discounting Dr. Hughes' opinion.  (ECF No. 23 at PAGEID ## 2451-2454.)  The Undersigned disagrees.

    As the Commissioner correctly observes, "[t]he ALJ did not discount Dr. Hughes' opinion because there were *some* record of normal findings," but rather because "Dr. Hughes'

opinion was contradicted by evidence from three different specialists . . . the mild findings from Plaintiff's lumbar MRI and cervical imaging . . . [and] Plaintiff's activities including her part time work activity at Home Depot [since] 2016."  (ECF No. 26 at PAGEID # 2471 (emphasis added).)  The Undersigned agrees with this characterization, and rejects Plaintiff's argument that "[t]he ALJ has not pointed to any evidence that contradicts Dr. Hughes' treating source opinions."  (ECF No. 23 at PAGEID # 2454.)  To the contrary, by directly linking Dr. Hughes' opinions to specific contradictory substantial evidence, including substantial evidence from multiple other specialists, objective diagnostic imaging, and Plaintiff's own testimony and activities of daily living, the ALJ was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend*, 375 F. App'x at 550.  The ALJ therefore provided "good reasons" for discounting Dr. Hughes' opinion, and Plaintiff's first assignment of error is not well taken.

**B.    The ALJ's RFC Adequately Accounts for Plaintiff's Gastrointestinal Issues**

Plaintiff also argues that the ALJ committed reversible error by failing to explain the reasoning behind the limitation within the RFC for Plaintiff "to have two additional bathroom breaks of no more than five minutes both before and after lunch or meal break."  (ECF No. 23 at PAGEID ## 2455-2458.)  Plaintiff describes this limitation as "seemingly arbitrary," and argues that it is "not supported by the record nor does the ALJ provide any sort of explanation as to why this particular limitation is supported by the record."  (*Id.* at PAGEID # 2455.)  Plaintiff further submits that "[t]he ALJ's failure to provide any sort of explanation casts doubt as to the credibility of the [RFC] and whether it is an accurate representation of [Plaintiff's] maximum [remaining ability to perform basic work activities]."  (*Id.* at PAGEID # 2457.)  Plaintiff also

argues that "the record contains evidence of the need for more bathroom breaks than allowed by the [RFC]." (*Id.*)

In response, the Commissioner argues that "[t]he ALJ acknowledged that Plaintiff reported frequent bathroom breaks totaling up to ten bowel movements per day . . . [but] the ALJ noted that Plaintiff's abdominal examinations were routinely within normal limits [,] . . . Plaintiff had not required any follow up treatment since May 2017, did not take any biological therapy, and did not require the use of adult undergarments[,] . . . [and] Plaintiff's most recent colonoscopy showed her Crohn's disease was in deep remission." (ECF No. 26 at PAGEID ## 2476.) Accordingly, the Commissioner submits that "[i]f the ALJ made any error, it was including a limitation in the RFC that no doctor thought was necessary." (*Id.*) To that end, the Commissioner stresses that "[s]ince no medical professional indicated that Plaintiff's IBS caused more limitations than noted in the ALJ's RFC, the [C]ourt should affirm the decision." (*Id.* at PAGEID # 2477.)

The Undersigned agrees with the Commissioner, especially given Plaintiff's inability to identify any medical evidence that additional restroom breaks were necessary for Plaintiff. *Jeley v. Comm'r of Soc. Sec.*, No. 2:19-CV-3107, 2020 WL 4528823, at *6 (S.D. Ohio Aug. 6, 2020), *report and recommendation adopted*, No. 2:19-CV-3107, 2020 WL 5793183 (S.D. Ohio Sept. 29, 2020) ("To the extent Plaintiff argues that the ALJ should have incorporated more restrictions in this RFC based on this impairment, he has failed to adduce any evidence that the impairments required further specific work-related limitations. As the Sixth Circuit has noted, evidence of a diagnoses does not say anything about the severity of an impairment.") (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (explaining that the "mere diagnosis of [the condition] . . . says nothing about the severity of the condition") (internal citation omitted)).

Contrary to Plaintiff's suggestion, the ALJ did consider Plaintiff's testimony that she requires frequent bathroom breaks.  (R. at 19, 23.)  That was not all of the relevant evidence, however, and the ALJ also considered contradictory evidence, including Plaintiff's most recent colonoscopy which demonstrated that Plaintiff's Crohn's disease was in deep remission.  (R. at 18.)  The ALJ also expressly considered evidence of Plaintiff's daily living activities, including the fact that Plaintiff currently manages her gastrointestinal issues without treatment, therapy, or adult undergarments, and reasonably concluded that such substantial evidence "suggest[ed] her symptoms are not as serious as alleged."  (*Id.*)  The Undersigned agrees with the ALJ's analysis and finds that this substantial evidence, taken together, supports the ALJ's RFC limitation related to Plaintiff's restroom breaks.

For these reasons, it is **RECOMMENDED** that Plaintiff's contentions of error be **OVERRULED**, and the Commissioner's decision be **AFFIRMED**.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 30, 2021                                   /s/ *Elizabeth A. Preston Deavers*_____
                                                      **ELIZABETH A. PRESTON DEAVERS**
                                                      **UNITED STATES MAGISTRATE JUDGE**

24